May it please the Court, my name is William Bates. On behalf of the appellant with me is Patrick Weston, my colleague, and I'd like to reserve five minutes. Certainly. I'm going to begin, Your Honor, with the reason why the entire judgment should be reversed, which is the failure to prove the element of damages. Then I'll proceed to our alternative argument that if the award stands, there should not be prejudgment interest. And if time remains, I'll treat punitive damages. The case comes to you as a denial of a JMOL motion, and the standard of review is therefore de novo. The plaintiff below, Convenient Automation, raised $3.245 million in two private placements of debt. And the compensatory damages which were awarded exactly equal the amount raised. And that is not by coincidence, because that is the amount, that is the only amount that was mentioned in the closing argument as the amount for damages. And the problem is that the amount of damages allowed under the law is not the amount that's raised in those private placements. The plaintiff here is not one of the investors under those private placements who claims that he or she was defrauded by something that Compaq said into investing the money. The plaintiff is the company which received the money and is claiming that it spent it in reliance on misrepresentations by Compaq. And therefore, that is what needs to be proven, and we know as a matter of incontestable fact that it was not, and here is why. And one of the reasons it was, because you objected to proof of allocation, right? Absolutely. Because, Your Honor, the district court judge held that because of lack of forthcomingness by the plaintiff's counsel below, their expert, their evidence was restricted. Yes. They said you cannot offer opinion evidence as to allocation of the trial. And so we took that pretrial ruling, and every time they tried to offer that evidence, we said, Your Honor, you said this would not come in. We object. And every time, the judge sustained us. Yes. But that then may have caused the unintended consequences of the jury being faced with an all-or-nothing decision on damages, right?  Well, the jury has been proven. Right. And the only proof given to the jury was proof of the wrong element. And therefore, we submit the jury's verdict was improper as a matter of law, and the judgment, and judgment as a matter of law, should have been entered for Compaq. One reason we know it is wrong is because included in that amount is most of the $450,000 that was raised in the first offering that was used to repay old debt. Counsel, didn't Barron testify that he wouldn't have raised, invested, and spent the entire amount had he known the truth? And didn't that testimony support the jury's finding that the whole amount was attributable to the tandem deal? I'm sorry. I did not hear that entire question, Your Honor. I'll try again. I was referring you to Barron's testimony that the income received from other sources was minor, and that he wouldn't have raised, invested, and spent the entire $3 million had he known the truth. And my question is whether that testimony supports the jury's finding that everything was attributable to the tandem deal. It does not, Your Honor. And it doesn't for the reason set forth in the Bechtel case, which we cited. And that is, Bechtel says that it is insufficient to say that all – everything about the business is attributable to representations that go to something less – about something other than the entire business. In Bechtel, the land seller was sued for misrepresentations, and the plaintiff was allowed to recover the costs of drilling new wells, whereas the only representations dealt with the old wells. And the judge or the panel said, you need to tie more specifically than that the consequences to the misrepresentations. And Mr. Barron's did not try to do that. He admitted, for example, that some of those funds were used to repay old debt. Now, if I am owed money by – if I owe money to A, and I borrow the $5 that I owe A from B, I have not been damaged. I repay A. I'm still owing $5 to somebody. I've simply substituted creditor B for creditor A. I'm in exactly the same economic position. Except here, wasn't there testimony that all of the programs unrelated to the tandem deal were self-sustaining, which would negate your example? It would not, Your Honor, because there would still be a hole, if you will, of the – all of that old repayment of debt that went out, even if those programs were self-sustaining. In other words, if the rest of the business were in exact equipoise, and I raised this $3.245 million, and I spent some of it on non-recoverable expenses, I could not recover all of it on the basis that it was – that it was damages. But let me address more directly the evidence which bothers you about the self-sustaining nature of those operations. The plaintiff admitted that it had not only the windows-based business – I'm going to adopt the shorthand that's used in the briefs – the windows-based business on which it dealt with Compaq, but a preexisting DAS-based business that it continued. And it admitted that it continued. We disputed at trial its extent, but it was admitted that it continued. And in the plaintiff's brief on appeal, it says that the evidence shows that it was self-sustaining, and they cite to the revenues that it was self-sustaining which totaled some $628,000. I'm now on, excuse me, page 23 of the plaintiff's brief on appeal. And they acknowledge costs of some $255,000, and they say, see, we had $340,000 to play with. The problem with that, Your Honor, is that there is no cost of goods sold in that calculation. When you look at their financial statements for the year in question, 1997 – and this is at excerpt of record, page 316 – you find expenses, and one of the expenses is purchases, costs of goods sold. And it itself is $357,000. So it is simply not true, even under the plaintiff's own evidence, that that business was self-sustaining for the year for which they offer any proof, which is 1997. 1996 is also included, at least half of that year, in the damage calculation, and there was no proof as to self-sustaining in 1996. So the problem that we have, we believe, is that the only piece of evidence that is really relied on by the plaintiff is Mr. Barron's statement that I wouldn't have raised or spent but for these representations. There needs to be more of a tie than that.  Counsel, why is that if the principal testifies and our review, the standard of review is very differential when there is a verdict in favor of one of the parties, why isn't the principal's testimony sufficient if believed by the jury? The reason is that there must be substantial evidence. That must be more than a scintilla of evidence. That kind of flat statement, Bechtel says, is not enough. The President, Mr. Hubbard, made essentially the same statement. The trial judge struck it as being without foundation. We did not object through oversight to Mr. Barron's statement. We've indicated to you, but it came at the end of a dialogue in which the judge said, I'm not going to let you allocate. I think that's opinion testimony that you're not permitted. We cited you in the brief a case that says that if the testimony should have been stricken, you can regard it as having been stricken. So I concede for purposes of this argument that it's still in the record, even though we believe it should not be. But Bechtel says it is not enough. The expenses that we cite, such as paying for art for the lobby, paying for the Christmas party, there is simply no way that all of those monies were expended because of any representation that Compact made concerning the Windows-based business. I have a question about the Bechtel case. In Bechtel, page 1341, I believe, the court said that Bechtel presented evidence as to all the expenditures on the farm for a certain period without any showing that the expenditures were actually the consequence of the misrepresentation. And I don't read in Bechtel, and maybe I'm missing something, that there was similar testimony to Mr. Barron's testimony here, where a principal said, I am looking the jury in the eye and saying that because of the nature of our business, none of this money would have been raised, spent, et cetera, in the absence of the misrepresentation. Was there something similar to that in Bechtel that we said was insufficient? There was no such, you are correct, there was no such statement. There was a reading of expenses to the jury from a list as the proof of the damages. The court of appeal on review looked at this and said, and I'm sorry, I have a Lexis printout and I can't find the reporter page site, but by no stretch of the imagination, can many of the expenditures claimed by Bechtel meet the test of establishing a causal nexus with a good deal of certainty? And I submit to you, Your Honor, that that one statement by Mr. Barron's does not do so either. It is without foundation, it is contradicted by all of the evidence concerning the, not the raised, not the raised, the raised part is irrelevant. It may well be that Mr. Barron's would not have gone out and on behalf of the company borrowed this money unless he had those representations that the jury found were incorrect. But the expenditures, there was an existing ongoing business which demanded rent every month, which took art for the lobby, which took a Christmas party for the employees. There is no causal nexus, certainly not in Bechtel's words, with a good deal of certainty between such expenditures and any representation by Compact. In addition, if I, let me just change subjects for a moment here. There is a, there is an additional problem which is that not all of those expenses get to count against Compact's account because some of them were contractually required. We point out in the brief that there is Arizona law that says you cannot claim that you spent in reliance on a misrepresentation an amount you were required to spend anyway. And we have shown you in the brief that there are several such expenditures, hundreds of thousands of dollars, all within that $3.245 million. The only way you get to that total is by counting them, and under Arizona law, you're not allowed to count them. The contract required, the contract between Compact and the plaintiff required those expenditures, excuse me, and the contract, notwithstanding the misrepresentations that were found, was upheld. It was in force. Our counterclaim under that contract was granted by the judge to the tune of $300,000. I'm running out of time. I'd like to turn. Ginsburg. You didn't object to the damages instruction, did you? There was colloquy about the damage instruction, but we agreed at the end of the day that it needed to be the amount spent in reasonable reliance on any misrepresentations found by the judge. You don't challenge the instruction in your appeal, do you? No, sir. Let me deal with the prejudgment interest question. And obviously, if we're talking about this, we're doing it only because you rule against us on the issue that we've talked about. Even if you find that there is some way to tell how much convenient automation spent during the damage period, that's not enough to award prejudgment interest on that amount. You must also conclude that those damages can be computed, based on the evidence, of course, exactly, without opinion or discretion under the Arizona law. And I obviously do not know how you would get to finding that the damage was reproved at all, and so I can't assert with certainty that you could do so finding that they were sustained exactly without opinion or discretion, but you need to examine that question if you decide against us and determine that it has been proved. In addition, that's one hurdle. There's another hurdle. You also must decide that plaintiff gave Compact data to support and document the calculation of its claim, because interest doesn't begin to run, prejudgment interest doesn't begin to run under Arizona law until that occurs. The plaintiff relies on one and only one submission for that, and that is a letter in which Compact acknowledged the plaintiff's claim, receipt of a claim from the plaintiff, that Compact is responsible for the, quote, responsible for the $3.2 million in debt convenient automation chose to take on. That's at page 769 of the excerpt of record. And that isn't enough for the reason that I dwelt on in the first part of my argument, which is that the amount of debt the plaintiff chose to take on is not the measure of damages. And therefore, telling us the amount of debt that they chose to take on is not telling us, giving us the information from which we can calculate with precision, without discretion, the amount of their damages. Your Honor, I don't think I'm going to reach my third point, because I would like to reserve time to respond. All right. Farewell. Good morning, Your Honors, and may it please the Court, my name is Scott Boehm. I'm in from Phoenix representing Plaintiff Convenient Automation. As you probably know from reading the briefs and the record in this case, I'm new to this case. I was hired after the trial and, in fact, after the briefs were written. That's only significant because my introduction to what this case was about was essentially the same as the Court's, reading the opening brief. And frankly, when I read the Mr. opposing counsel's opening brief, I thought, gee, they make some good points here. But then I went and got the transcript and read the trial and found out what happened at trial and realized that they have left out all the bad stuff. As Paul Harvey used to say on the drive time radio, the rest of the story, if you will. The jury here certainly knew the rest of the story, and Judge Teelborg certainly knew the rest of the story. What they are, the defendant is, in essence, asking this Court to do is retry the facts of this case on part of the facts spun the way the defendant wants you to spin them. Well, to cut to the chase, there wasn't much damage evidence, right? There was less damage as evidence than was intentionally intended. However, when Judge Teelborg made the evidentiary ruling regarding the accountant's the financial records that had, by that time, already been admitted were the best evidence and there was no real need to have the accountant come up and read to the jury what these various entries on the financial records say, especially in this. This was picked up on, of course, by my predecessor counsel here. He specifically referred primarily to a trial court, Exhibit 115, which I will get to in a minute, discussing Judge Graeber's concerns, but he specifically referenced that during his questioning to the witnesses, and more particularly to the plaintiffs. The only witness who testified was Behrens, right? I'm sorry? The only witness who testified as to any figure that might conceivably involve damages was Behrens, right? No, sir, that's not correct. Okay. Enlighten me. Jim Behrens was the CEO. He was the actual, before this thing got started, he was the person to whom the convenience went for, to get the funding up and running, and at the insistence and, well, maybe not insistence, but strong urging from the defendant, he eventually became CEO of this operation. But in addition to his testimony, which his, and I would emphasize that his testimony alone would be sufficient to put down all of their damages arguments, in addition to his, also Gary Hubbard, who was the day-to-day president of the corporation, the founder, and who also testified as to what was done, what percentage of the work was done relative to the windows program as it pertains to DOS. So both of these witnesses testified quite a bit, frankly, about the damages. What they're asking the court to do here is essentially, I mean, none of these arguments. Well, Hubbard didn't testify as to the entire amount, though, did he? I'm sorry, sir? He didn't testify as to the entire amount. No. He just generally described what the company was going to do with money in some respects. One of the things that Hubbard testified to, which is very relevant to the damages issue, because, and I'll get to this in a minute, it needs a little bit of a setup here. Their essential argument is that these private offerings raised $3.245 million and that that amount was not all spent on the stuff related to the windows, the contract with Compaq. Gary Hubbard testified during his cross-examination that approximately initially when the first Compaq work was done, about 10 to 20 percent of their work was still at that time being devoted to DOS, and then that trickled out to virtually nothing as the time expended. The significance of that regarding damages is the defendant has extrapolated that testimony to say that 20 percent of their time was devoted to DOS, and therefore, the expenditure of the $3.245 million could not have all been their fault because some was related to DOS. The problem with that argument, the fundamental problem with that argument, there are several, but the main problem is it's a shell game. What they're not telling you, and it's nowhere in the opening brief, it's clearly in the financial records that were given to the jury, the total revenue for Compaq or for convenient during this time was not the $3.245 million. That's just what was obtained and spent in reliance on the fraud and misrepresentations of the defendant. And keep in mind, they're not debating or raising at all an appeal that they did not commit the fraud or the misrepresentations. What they don't tell you, excuse me, is that another $1 million was raised in 1997 alone. This is reflected on Exhibit 115, given to the jury, discussed with the jury. The revenues and sales of DOS stuff, which were the only sales made at that time, was $703,000. There was a common stock purchase of $52,000, additional paid-in capital of $189,000, and a loan from a shareholder of $103,000. This totals $1,047,000 in additional funds into convenient during 1997. Now, this is 30 percent more money than the 3.2. It's 30 percent more that they're not telling you about. The significance of that is the Gary Hubbard testimony that I talked about. They're trying to take Hubbard's testimony and say that 20 percent through the whole time was spent on DOS. Well, even if you give them the benefit of that, which I don't think the evidence supports, but if you give them that whole benefit, we're still 10 percent above that. There's a of the $4.2 million total of the of the what came in, separate from the private offerings, and the private offerings, still puts you, after you take out the entire 20 percent, $420,000 to the good. That, Judge Graber, goes specifically to your question about self-sufficiency of the DOS program. Now, this can be looked at another way. If you want to take out back away from Hubbard's testimony. Well, let's take let's take part of Hubbard's testimony, though. Didn't he testify that about $450,000 to $500,000 was used to pay off old debt? Yeah, and I'm not sure if that was Hubbard's. I thought that was Barron's. They may both have covered that. The significance of that, Your Honor, and Mr. Bates brought that up during his old argument, or during his opening argument, was that Barron's expressly testified, as Judge Graber pointed out, that all of that money, including the initial offering of $500,000, $450,000 which was used, was raised and spent based on defendants' lies and misrepresentations. Barron's also specifically told the jury, explained to the jury, actually, that he was told by, at the time, he was just raising money for this other company. And Beauvier, who they conveniently overlook in most of their briefs, especially regarding the punitive damages stuff, he was the bad guy here. He told Barron's that he needed to get involved personally in this operation, clean up the management, get things cleaned up, and get ready for a rapid move forward, start hiring people. What they also forget to tell you in their opening brief or in their oral argument is that the initial $450,000 was raised in June, or the offering was in June. So assuming the money came in fairly shortly thereafter, we're talking summer of 1996. The porting agreement, the work for these people, the ramping up for these people, began four months earlier. So a lot of the debt, and the jury knew this, this is all, this is not even debated. The jury knew that for four or five months prior to the 450 coming in, they were So a lot of these so-called bad prior debts were debts incurred while they're doing the DOS or, excuse me, the windows work. With regard to their, their, let me back up a little bit. If your expert had testified, how would, what number would it be allocated to damage? Can you tell me that? Exactly what was asked. The end result would have been exactly the same, because we've started from the beginning of this case, all the way through standing here today, that our damages in this case caused by the defendant's conduct or other losses, but what they actually caused us to lose was the $3,245,000. The $500,000 initial offering of which $450,000 was spent on this and the $2,795,000 second offering, and that was told to the jury the first day. It was repeated through the trial, and it was told in the closing arguments by my predecessor, specifically told the jury that our actual damages were just what I told you. Barron's testified that the entire offering money, the $3,245,000, was spent in reliance on the lies and misrepresentations of Pierce and Beauvier. That's the only reason that Barron's trial testimony is about 60 pages long. I read it again on Sunday, and it just slams them on this case, and that's why I'm      Regarding their argument that Convenient failed to account for some percentage of the conversion work that was still being on DOS, excuse me again, I'm a little dry this morning. The undisputed testimony was that Convenient started this work, continued this conversion work solely because of the contract with Compaq. They understood that Windows was eventually going to be coming down the road, but they had no immediate plans or, frankly, finances to do the transfer or the conversion porting work themselves. The distribution and licensing agreement is also significant, but again, they don't tell you about this. Any direct sales that we were going to get the benefit of, the problem with that is fourfold. One, they had exclusive right to all the big target markets. If there was a market that we were going to sell direct sales to, they had first right of refusal. If it was too small for them to want to get involved, we still had to give them a cut of the proceeds until we paid them their $300,000 back under the docketing agreement. And more importantly, most importantly, fundamentally, why we're all here today is because we never got the sales. They yanked the rug out from under us before we even got to any benefit to us or, frankly, them. They make the same argument regarding the programmers. There were some of the 36 eventual programmers that were hired and the salespeople, some of these folks were doing DOS. And Mr. Bates specifically asked this to Hubbard during his direct testimony. Falls into their argument that the 345 wasn't all spent. Hubbard's response was to the question of did you have other programmers who were working on DOS during this time, and I quote, not really. And then he went on to explain that of the 36 programmers that they'd ramped up and accelerated and spent money on, one guy was assigned part-time to answer DOS questions, but there weren't very many of those DOS questions because DOS was up and running. This is January 14 trial testimony beginning on page 180. The jury knew all about this. The jury heard their argument. This is not new to us. Maybe the jury included the little specifics. Maybe they didn't, because under Arizona law, it doesn't matter. All Arizona requires is that the jury with reasonable certainty give damages a fair estimate of the damages. There's no mathematical precision required, as this Court recognized years ago in the Kissel case in 1979. I'd like to talk briefly about the self-supporting of the DOS. Because that seems to be quite a bit what they've argued about. And, Judge Graber, you brought that up in your questioning. If you take away Hubbard's testimony that it was overall 20 percent, and you actually look at Exhibit 115 and take out all of the costs related to DOS, which is all the sales, the customer, the C-Store sales, the sales commissions, the sales subs, all of these items, which are right there, and I don't expect you to take my word for it. They're right listed right in the document. That totals $255,000. And then if you take, again, giving them the full benefit, if you take 20 percent of everything else, the total expense for the DOS stuff is 595. DOS is still money ahead, because, as I've already discussed, the records reflect that DOS sales in 1997 alone were 703. So not only was DOS stuff self-sufficient, it was 108,000 to the good. So if you take that 108,000 and you add in the stock receipt, the capital contribution, the other things I talked about, that's $452,000, which probably was spent on Christmas parties and weekends at the Squaw Peak Hilton and the art and stuff that they're talking about, all before you even get to the 3.2 that Jim Behrens expressly testified, again, as Judge Graber pointed out, was raised and spent specifically on the misrepresentations of the defendant. I'd like to talk a brief minute about punitive damages. Mr. Behrens didn't or, excuse me, Mr. Bates, I'm sorry, didn't get to that, but it's a significant part of their argument, and the problem, again, is that they don't tell this Court the rest of the story. They admit that the – and it's worth emphasizing that there are no evidentiary issues here. There are no jury instruction issues here. There are no legal issues here. It's all fact-based arguments. The problem, again, they don't tell this Court the rest of the story, the rest of the facts. Everything bad for them is omitted. Regarding punitive damages, they admit that the jury was properly instructed under the Bradshaw standard, under Arizona law, which is a conscious pursuit of a course of conduct knowing that it created a substantial risk of significant harm. That's the evil mind, conscious pursuit. This is what we call evil mind under Arizona law. They say that this fraud doesn't rise to that, but they don't tell you about Pete Beauvier. He's the bad guy. He's the evil mind. The jury was told this repeatedly over and over and over again. He's the head of the U.S. sales. He's the one that said the tandem put in 5 million bucks. He's the one that said major sales were in the pipeline. He's the one that said hire these people, get things ramped up. If you don't get things going, if you don't spend this money, we're going to pull the plug on you. Turns out he was a liar, and they even said it. They stand up in the closing argument, and I quote Mr. Bates, we admit that Pete Beauvier wasn't a very truthful fellow. Well, that's an understatement. Then they go on to admit that he was fired for being a liar and lying in this case and every other case. Judge Kielburg understands punitive damages. He was a trial lawyer in Phoenix, and a damn good one, frankly, for over 30 years. He understands the Arizona proof requirements for causation, for damages, for punitive damages. And this guy stood or the defense stood up and admitted that this guy on whose fraud and misrepresentations we're suing was a liar. Clearly a jury question, and they argued to the jury that they shouldn't be, although they're legally responsible for his actions, that the jury shouldn't hold him responsible because he was a liar and we found out he was a liar and we got rid of him. It didn't work. All these arguments they're making now didn't work below. The – I've got two minutes left, just a couple of brief comments on the prejudgment interest. In essence, it rises and falls with their damages argument, which is invalid for the reasons I've already discussed. The standard for awarding prejudgment interest is the Gemstar v. Ernst and Young case, which is actually a case that I had back in Phoenix in the late 90s, emphasizes that prejudgment interest is a matter of right if the amount is liquidated. And the amount is liquidated under Arizona law if it can be computed without reliance on opinion and discretion. As I mentioned to the Court previously, our position from the get-go, from before the lawsuit was even filed, starting at the April 2nd meeting, when we told them that they owed us the 3.2 for our reliance on their fraud. This was confirmed by them in the April 3098 letter, which is the date that the judge Teelborg picked. I think he probably could have picked April 2nd. That's a discretionary decision on his behalf. We're not going to quibble with it. But if you accept Behrens's testimony as validated by the Exhibit 115 and the other exhibits in the record that were given to the jury that the jury could look at, there's holes all over their argument. And that's why the jury found in our favor, and that's why they gave the specific amount of damages that we requested, a liquidated amount, and it was entirely appropriate to award prejudgment interest. Thank you, Your Honors. Thank you, counsel. You didn't get to punitive damages, but your opponents raised it, so why don't you start there? All right. If I may, I want to address the parts of my argument that he did hit and then turn to them. He began by saying the financial statements are the best evidence. We actually don't disagree with him on that. But we do disagree with him about what they show. For 1996, they show nothing because there is no 1996 financial statement. For 1997, the Exhibit 115 that he points to, he says, shows that the DOS sales made a profit. It's undisputed that the only sales were of the old DOS product. The compact Windows product never happened. And at Excerptive Record 316, the gross profit or, I'm sorry, the total cost of sales are shown as $686,000. They are not the $255,000 that counsel mentioned in his argument. And again, most of the difference is that the things that he counts as expenses do not include any of the purchase price of the goods that they resold and the expense, of course, when they resold them. He mentions that the prior he mentioned that there had been work in connection with the compact program prior to that first offering, and maybe that's where some of those old debts came from. I don't believe that's factually true, but I'm not going to try and unwind the record in that respect. I'm going to point you instead to the fact that the only damages that they can get are things that they spent in reliance on misrepresentations by compact, not anything to do with compact. And Judge Teelborg ruled that the first misrepresentation that they could try to prove was one that might have occurred on the 29th of May. You'll find that in his pretrial order at page 51 of the excerpt of record. So if there were debts incurred prior to that date because of some expectation of working with compact, they were not incurred on account of any misrepresentation because Judge Teelborg ruled that none could no such representation could be proven at the trial. As to punitives, oh, and the last thing is, according to Mr. Beam, if you look at Exhibit 115, you can find an additional million dollars, I think he said, of funds flowing into the company in 1997, and I tried to do that while he was speaking, and I don't see it. I commend it to you for your study. As to punitives, we actually did quibble with the instruction that was given as to punitives, because we believe that it should have said that there had to be an element of outrage similar to that usually found in a crime. And we drew that from the Rawlings case, which is an Arizona case in the Restatement Second of Torts, and we believe that that is the correct standard. And I can't argue the evidence on that to you today, but I can tell you that as you look through this, you will find that what caused the damage to the plaintiff here is that Compaq's program was canceled and they were set adrift. But it wasn't only the cancellation of one program. The entire division of Compaq, under which this program and many, many others were sponsored, was let go on a budget cut. They convinced a jury that they'd been misled and they'd been assured that nothing would happen, and this was all a fraud on them. I commend to you that record, because I think that when you go through it, you will find that this is nothing more than their own private placement memo said is what you might expect if you start dealing with a large company. These things can happen. There are no guarantees. That's what their private placement memo said. And that no matter what you find, you will find that it does not rise to a level of outrage similar to that usually found in a crime. Thank you very much. Thank you both for your arguments and your briefing. The case is heard and will be submitted and will be in recess for the morning. I feel like I can't fucking play this with Barron's head. This is gonna fail me this time.
judges: Thomas, Graber, Paez